UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| APRIL DAMIANI as Administrator for the ESTATE OF JOSE DAMIANI, JR., and on behalf of herself, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 4:16-cv-00053-RLY-DML |
| MICHAEL ALLEN, BOBBY TROUTMAN, SHANE STAGGS, PAUL SUDING, TOWN OF WEST BADEN SPRINGS, and TOWN OF FRENCH LICK | ) ) ) ) ) | |
| Defendants. | ) | |

**ENTRY ON THE PARTIES' MOTIONS TO EXCLUDE AND LIMIT EXPERT TESTIMONY AND ON THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

On September 4, 2015, Trooper Michael Allen and Officer Robert "Bobby" Troutman responded to a 911 call concerning a domestic strangulation in French Lick, Indiana. April Damiani, the 911 caller, summoned law enforcement to help her husband, Jose Damiani, Jr., calm down after he had been drinking and acting strangely. Unfortunately, April's plea for help ended tragically: less than a minute after arriving, the officers shot and killed Jose.

April brought the present action alleging that the officers had deprived Jose of his constitutional rights and had violated Indiana law. She also alleges a variety of claims against different police departments and some of the investigating personnel. The parties

have filed opposing *Daubert* motions, and each Defendant has moved for summary judgment.

As explained below, none of the proposed experts will be barred from testifying, but certain opinions will be limited or excluded. Plaintiff's claim of excessive force and corresponding state law claims should be resolved by a jury, but Defendants are entitled to summary judgment on her remaining claims. Part I sets forth the background facts related to Jose's death. Part II discusses the *Daubert* motions. Part III provides the analysis and resolution of each motion for summary judgment.

## I.    Background

### A.    Events leading up to the shooting

Around 1:15 p.m. on September 4, 2015, Plaintiff came home from work and greeted Jose. (*See* Filing No. 136, Ex. T-3 Interview of April Damiani ("April Interview") at 3:00[1] – 3:11).[2] He was working in the backyard and had been drinking prior to Plaintiff's arrival. (*See id.* at 3:20 – 3:30; April Dep. at 64:1 – 3). The two finished their conversation, and Plaintiff returned to the house to change out of work clothes. (April Interview at 3:29 – 3:33). At some point later in the afternoon, Plaintiff's friend, Mimi Groff, drove her to the bank so that Plaintiff could cash her check from work. (*Id.* at 3:40 – 3:56).

---

[1] The time corresponds with the time stamp when the audio file is played in a media player.
[2] Plaintiff gave a recorded interview to police shortly after the shooting. She was played the interview at her deposition and admitted that the interview was accurate. (Filing No. 134-1, Deposition of April Damiani ("April Dep.") at 208:1 – 4).

When Plaintiff returned home from the bank, Jose had become intoxicated. (*Id.* at 4:20 – 4:45). He had consumed a portion of a pint of vodka and four beers from a six-pack—both of which he had purchased earlier that day. (*Id.*). She tried to have a conversation with him, but his behavior was noticeably erratic. (*Id.* at 5:05 – 5:40). At one point, Jose was upset with Plaintiff explaining that she and the children were ungrateful. (*Id.*). At another point, Jose stood up and gave Plaintiff a hug and told her that he loved her. (*Id.*). Eventually, something "flipped his switch to crazy." (*Id.* at 6:00 – 6:17). Jose stood up and began choking Plaintiff. (*Id.*). After a brief struggle, Jose told Plaintiff to call the police, and he exited the house to the backyard. (*Id.* at 6:18 – 6:22). Plaintiff went to the bathroom and called 911. (*Id.* at 6:34 – 6:37). She told the operator that her husband had choked her and that he had been drinking. (*Id.* at 6:41 – 6:46).

**B.      Response from law enforcement**

Across town, West Baden Springs Officer Bobby Troutman and Indiana State Trooper Michael Allen were side-by-side in their patrol cars talking. (Filing No. 146-5, Deposition of Michael Allen ("Allen Dep.") at 129:7 – 14). They had just finished handling a previous situation at a local gas station. (Filing No. 130-1, Affidavit of Bobby Troutman ("Troutman Aff.") at 2, ¶ 6). Because of the limited number of officers on staff at each police department, West Baden Springs police officers frequently respond to

situations in French Lick, Indiana and vice versa.[3]  (*Id.* ¶ 7).   It is also common for each

department to receive assistance from the Indiana State Police.  (*Id.*).

Just as Trooper Allen was about to go to another county, Officer Troutman

received a 911 call over the Orange County dispatch concerning a domestic dispute at

8399 West Ohio Street in French Lick, Indiana—the Damiani residence.  (*Id.* ¶¶ 6, 10).

Trooper Allen also heard the dispatch because he has a county radio installed in his patrol

car.  (*See* Allen Dep. at 131:2 – 10).  The dispatch advised:

> I have a pending 1016 . . . Clear signal eight address of 8399 West Ohio
> Street. 8399 West Ohio Street, Damiani residence. The female advised her
> husband 1056 attempted to strangle her. She's now in the bathroom. Also
> advised there are small children there. He's out in the shed at this time.

(Filing No. 130-2, Orange County Dispatch Transcript at 2:7 – 15).  A "1016" is a

domestic disturbance, and "1056" means the individual is intoxicated.  (Allen Dep. at

122:19 – 25, 123:1 – 11).  Officer Troutman interpreted "pending 1016" as a

strangulation in progress.  (Troutman Aff. at 2, ¶ 8).  Trooper Allen decided to assist

Officer Troutman, and so both officers drove to the Damiani residence.  (*Id.* ¶ 10); (Allen

Dep. at 133:1 – 19).  The officers were *en route* at 3:52 p.m. and arrived at 3:53 p.m.

(Troutman Aff. at 2, ¶ 13).

Trooper Allen ascended the porch with Officer Troutman right behind him.

(Filing No. 146-3, Deposition of Officer Troutman ("Troutman Dep.") at 43:1 – 7).  After

the officers' knocked and announced their presence, Plaintiff answered the door and told

---

[3] West Baden Springs is approximately two miles north of French Lick.  Fed. R. Evid. 201(b)(1);
*Tobey v. Chibucos*, 890 F.3d 634, 648 (7th Cir. 2018) (noting a court may take judicial notice of
a fact not subject to a reasonable dispute).

the officers Jose was out back. (Allen Dep. at 211:13 – 17); (April Interview at 7:07 –

7:11). She directed them to go around the side of the house. (*See* Allen Dep. at 215:1 –

7, 219:1 – 15). While the officers were moving around the side of the house, they heard

metal clanking sounds emanating from the backyard. (Troutman Aff. at 3, ¶ 16).

Trooper Allen told Officer Troutman to get his taser ready. (*Id.*). Plaintiff had gone

through the house and now was standing on a hill as the officers arrived in the backyard.

(*See* April Dep. at 92:15 – 25, 93:1 – 13). The officers shouted Jose's name twice as the

metal clanking sounds continued. (April Interview at 7:11 – 7:13); (Allen Dep. at 231:2

– 9).

What exactly happens next is disputed. The officers explain that they saw a male

subject moving around and working in the shed. (Troutman Aff. at 3, ¶ 17; *see* Allen

Dep. at 233:17 – 24). The officers then asked Jose to come out and show his hands, but

Jose did not respond. (Troutman Aff. at 3, ¶ 18; Allen Dep. at 232:15 – 22). When Jose

finally emerged, he was holding a five-foot iron pipe down by his side, staring at Officer

Troutman. (Troutman Aff. at 3, ¶¶ 19, 20; Allen Dep. at 238:24 – 25, 239:1 – 5). He

began walking toward Officer Troutman, ignoring orders to drop the pipe. (Troutman

Aff. at ¶ 21; Allen Dep. at 243:19 – 25, 244:1 – 23, 247:16 – 18). Jose then raised the

iron pipe above his head as if to strike Officer Troutman. (Troutman Aff. at ¶ 22). When

Jose was approximately eight feet away, Officer Troutman fired his taser. (*Id.* at 4, ¶ 23).

The taser was ineffective, and so Jose continued moving forward. (*Id.* ¶ 25; Allen Dep. at

282:6 – 22). Officer Troutman then pulled out his firearm and fired one shot from his

hip, while at the same time, Trooper Allen fired six times in rapid succession. (*Id.* at 5,

¶¶ 32, 34; Allen Dep. at 273:16 – 25, 274:1 – 4).  Jose was struck by six shots, all of which were fatal.  (*See* Filing No. 146-16, Autopsy Report at 2).

However, Plaintiff presents a very different account.  She explains that Jose was working in the shed with the radio on.  (April Dep. at 123:9 – 12).  When the officers reached the backyard, Officer Troutman yelled Jose's name, and he appeared inside the shed holding an iron pipe.  (*Id*. at 124:13 – 24).  As Jose was walking out of the shed, but before he reached the doorway, one shot was fired.  (*Id.* at 141:11 – 22).  After the first shot was fired, Jose continued to walk forward and stepped out of the shed.  (*Id.* at 126:5 – 6; 142:4 – 20).  Six more shots were then fired, and Jose collapsed over.  (*Id.* at 130:17 – 21).  The officers did not fire the taser before shooting Jose.  (*See* April Interview at 7:22 – 7:37; *see* Filing No. 146-52, Officer Troutman's Taser Log at 20) (noting taser was deployed at 3:58 p.m. which was approximately four minutes after shooting).[4]  At no time did Jose lunge at the police officers or raise the pipe in a threatening manner.  (April Dep. at 130:3 – 16; Filing No. 146-8, Rex Martin Dep. Ex. at 1, ¶ 4; Filing No. 146-10, Morgan Wilcoxen Dep. Ex. 2 at 1 ¶ 4).[5]

---

[4] Defendants present an expert explaining that this time discrepancy is explained by the fact that the taser experienced "clock drift" which means its internal time varies with real time when the taser is not periodically synchronized with an atomic, or real-time, clock.  (*See* Filing No. 134-17, Expert Report of Bryan Chiles at 8 – 10).

[5] In her recorded statement, Plaintiff stated that Jose "went at" the police officer.  (April Interview at 7:20 – 7:24).  At her deposition, Plaintiff explained that when she said "went at," she meant that he was going, or walking, towards the police officers.  (April Dep. at 89:5 – 12).  She also explained that he did not threaten the police officers.  (*See id.* at 130:3 – 16).

### C.     Events post-shooting and subsequent investigation

Immediately after the shooting, Officer Troutman advised dispatch that shots had been fired and requested an ambulance. (Troutman Aff. at 5, ¶ 37). He also advised that he had deployed his taser, and it was ineffective. (*Id.*). Trooper Allen told Officer Troutman not to move or touch anything until others arrived to the scene. (Troutman Dep. at 105:24 – 25, 106:1 – 2). Soon after the shooting, the officers heard screaming from neighbors behind them. (Allen Dep. at 155:15 – 25). One of these neighbors, Morgan Wilcoxen, came out of her house to see what had happened. (Wilcoxen Dep. Ex. 2 at 2 ¶ 5). The officers told her "to take [her] ass in the house before [she got] shot." (*Id.*). Rex Martin, another neighbor, approached officers but was told "to get back in the house before [he] get[s] shot." (Martin Dep. Ex. at 2, ¶ 5; *see also* Troutman Dep. at 108:13 – 15). During this time, neither officer checked Jose or administered first-aid. (*See id.* at 106: 6 – 10); (Allen Dep. at 155:15 – 25).

Within five minutes, an ambulance arrived at the scene, and paramedics tended to Jose. (Troutman Aff. at 5, ¶ 38). Michael Owen, a paramedic with IU Health Emergency Medical Transport Services, along with others, administered chest compressions, bag valve mask ventilations, and multiple IVs to try and resuscitate Jose. (Filing No. 130-15, Deposition of Michael Owen at 10:1 – 2, 45:5 – 20; 104:14 – 18). After Jose had been in a pulseless electrical activity rhythm for thirty minutes and noticing no return of pulse, Owen discontinued resuscitation at the direction of the ER doctor. (*Id.* at 54:3 – 14).

Shortly after medical personnel arrived to the scene, other law enforcement personnel arrived. (*See* Allen Dep. at 161:6 – 16). Trooper Allen and Officer Troutman

were escorted away and taken separately back to French Lick Police Department. (Allen Dep. at 152:12 – 20, 166:18 – 21, 169:7 – 20); (Troutman Dep. at 134:8 – 19, 138:2 – 6). Mark Green, the lead crime scene investigator, drove to the police department and collected both officers' clothes and weapons. (*See* Filing No. 146-15, Report of Mark Green at 1). Green then drove to the Damiani residence to collect additional evidence, which included the taser's wires, Jose's clothes, and the iron pipe. (*Id.* at 3).

Shane Staggs, a detective with the Indiana State Police, was assigned as the lead detective of the investigation shortly after the shooting. (Filing No. 146-20, Deposition of Shane Staggs ("Staggs Dep.") at 6:10 – 13, 171:23 – 24, 172:1 – 13). After arriving to the scene, he met with crime scene technicians. (Filing No. 146-33, Deposition of Mark Green ("Green Dep.") at 203:4 – 15). Staggs told the crime scene technicians the officers' account of what had happened. (*Id.* at 204:8 – 22). He also interviewed Groff, who was inside the house during the shooting. (Staggs Dep. at 85:24, 86:1 – 6).

At some point before the crime scene was released, Staggs was relieved of his duties as lead detective. (Staggs Dep. at 113:8 – 12, 176:18 – 24; Filing No. 146-19, Deposition of Stacy Brown at 178:5 – 25, 179:1 – 22). Paul Suding assigned the investigation to Stacy Brown, a detective from another district. (*Id.*). Paul Suding is the District Investigative Commander for Indiana State Police's Bloomington District. (Filing No. 134-14, Deposition of Paul Suding at 40:20 – 24).[6] Accordingly, Staggs did not further investigate the shooting, with the exception of a follow-up interview with

---

[6] Suding's only role in the investigation was to assign a detective to the case. (*Id.* at 74:12 – 17).

EMT Owen—a task which he was assigned approximately two months later.  (Staggs Dep. at 102:12 – 18, 130:7 – 10, 177:7 – 17).

### D.    Procedure

On April 4, 2016, Plaintiff brought the present action.  On November 15, 2016, she filed an Amended Complaint (Filing No. 59), which is now the operative pleading.

In September of 2017, each defendant moved for summary judgment.  (Filing Nos. 128, 131, and 133).  Plaintiff and Defendants then filed *Daubert* motions seeking to exclude or limit the testimony of the opposing experts.  (Filing Nos. 163, 165, 166, and 167).  All of the motions are fully briefed and ripe for decision.

## II.    *Daubert* Motions

As is often the case in excessive force disputes, each side has presented expert witnesses.  *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 808 – 809 (7th Cir. 2012) (noting that determining the true facts of a case often requires expert knowledge).  The court must therefore first determine what expert testimony is admissible before resolving the motions for summary judgment.  *See Estate of Robinson ex rel. Irwin v. City of Madison*, No. 15-cv-502-jdp, 2017 WL 564682, at *7 (W.D. Wis. Feb. 13, 2017).

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) establish the framework for analyzing the admissibility of expert testimony.  *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006).  Expert witnesses and their testimony must satisfy four requirements under Rule 702:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court is initially charged as a gatekeeper to determine whether a qualified[7] expert's opinions are sufficiently reliable and relevant. *See Daubert*, 509 U.S. at 589 – 592; *Lapsley*, 689 F.3d at 809.

An expert's opinions are sufficiently reliable when they are based on a sound methodology and can be properly applied to the facts. *See Daubert*, 509 U.S. at 592 – 93. This inquiry is "necessarily flexible" and the court has broad latitude in its determination of reliability. *Robinson*, 2017 WL 564682 at *8. At a bare minimum, though, the expert must be able to "explain the 'methodologies and principles' that support his opinion." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)).

An expert's opinions must also be relevant. *Lapsley*, 689 F.3d at 809. This means the testimony must "help[] the jury understand a matter beyond the knowledge and

---

[7] Expert witnesses must have minimum qualifications that provide an adequate foundation for their opinions. *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 643 – 644 (7th Cir. 2010). "[A]n expert may be qualified by 'knowledge, skill, experience, training, or education.'" *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (quoting Fed. R. Evid. 702); *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000) (holding expert who had "extensive academic and practical expertise" in designing employment evaluations was sufficiently qualified to render opinion on validity of promotion examination); *Robinson*, 2017 WL 564682, at *9 (finding police officer who had considerable training and a number of certifications was sufficiently qualified to render opinion on police practices).

experience of a layperson." *Robinson*, 2017 WL 564682, at *8 (citing *Daubert*, 509 U.S. at 591 – 592).

### A.    Dennis K. Waller

Plaintiff has offered Dennis K. Waller as an expert in law enforcement policy, practices, and procedures.  (*See* Filing No. 163-1, Expert Report of Dennis Waller ("Waller Rep.")).  Waller has a bachelor's degree in police administration from Michigan State University and a master's degree in public administration from Florida International University.  (*Id.* at 1).  He has over 3600 hours of law enforcement training and has served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief.  (*Id.* at 1 – 2).

Waller offers a number of opinions on Trooper Allen's and Officer Troutman's actions.  (*Id.* at 5 – 15).  He opines that the use of deadly force by both officers was extremely excessive, their actions deviated from nationally accepted standards of police practices, they recklessly approached the situation without obtaining more information, they conspired to present a "sanitized" version of the events to the public in order to avoid scrutiny, and the officers inexcusably failed to provide medical care to Jose after the shooting.  (*See id.*).

Trooper Allen and Detective Staggs (collectively the "State Defendants") have moved to exclude Waller's testimony entirely, arguing that his analysis lacks a coherent

methodology and that his conclusions rest exclusively with the jury.[8]  (*See* Filing No. 164, State Defendants' Brief in Support of Motion to Exclude, at 4 – 7).

As to their first challenge, Waller's methodology consists of  developing an understanding of the facts, analyzing the actions of the police officers, comparing those actions with the standards of police training and practice, and finally, explaining any consistencies or inconsistencies.  (Waller Rep. at 2 – 3).  The State Defendants argue that this is not a "testable" methodology.  That may be correct insofar as Waller's methodology is not a product of the scientific method, but it is well established that experts may base their opinions on experience.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 – 149 (1999).  There is nothing unreliable about Waller's methodology: he familiarizes himself with the facts, draws conclusions based on his knowledge and experience, and then explains those conclusions.  *Robinson*, 2017 WL 564682, at *10 (finding Waller's methodology sufficiently reliable). The State Defendants rely on cases that have excluded Waller's testimony, but those cases have primarily excluded his testimony for reasons other than a flawed methodology.  *E.g. Davis v. Duran*, 277 F.R.D. 362, 367 (N.D. Ill. 2011) ("Mr. Waller's opinions in this case are either irrelevant, go beyond his expertise, are conclusory, or would not be helpful to the jury.").

As to their second challenge, the State Defendants' argument is more persuasive. Expert witnesses may not draw legal conclusions.  *United States v. Sinclair*, 74 F.3d 753,

---

[8] Defendant Paul Suding also joined in this Motion.  However, as explained later, Plaintiff no longer intends to pursue claims against Defendant Suding.

757 n. 1 (7th Cir. 1996) (stating experts cannot testify about legal issues on which the judge will instruct the jury). Permitting such testimony "may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance." *Naeem*, 444 F.3d at 610 (citations omitted).

Several of Waller's opinions are problematic because they are legal conclusions and would not be helpful to the jury. First, Waller is not permitted to testify that Trooper Allen and Officer Troutman used excessive force (first opinion). *Thompson v. City of Chicago*, 472 F.3d 444, 458 (7th Cir. 2006) (upholding district court's decision to exclude expert testimony in excessive force case because "[i]ntroducing two experts to testify that Officer Hespe used excessive force would have induced the jurors to substitute their own independent conclusions for that of the experts"); *see also In re Estate of Lee v. City of Washington*, No. 3:09–cv–00016–RLY–WGH, 2010 WL 4778725, at *3 (S.D. Ind. Nov. 16, 2010) ("[A]n expert's opinion that a defendant law enforcement officer used unreasonable or unnecessary force is an impermissible legal conclusion and should be excluded.") (citation omitted). Likewise, Waller is also not permitted to testify that the officers and detectives conspired to present a "sanitized" version of the events to avoid public scrutiny (fourth opinion). This opinion is not relevant to proving plaintiff's conspiracy to use excessive force claim because the alleged conspiring acts came after the shooting. To the extent that it is relevant to prove Plaintiff's right to judicial access claim, the opinion is not helpful: a jury is more than capable of hearing the evidence and determining whether law enforcement covered up the shooting. *See Naeem*, 444 F.3d at 610 (citations omitted). Lastly, Waller is not permitted

to testify that the officers failed to provide Jose medical care (fifth opinion).  This is a legal question, and permitting this opinion would invite the jury to decide the case on an improper basis.  *See Thompson*, 472 F.3d at 458.

However, Waller will be permitted to testify that the officers deviated from generally accepted police practices (second opinion).  Whether the officers violated accepted police practices does not determine the outcome of Plaintiff's constitutional claims.  *See Naeem*, 444 F.3d at 610.  It will also be helpful for the jury to hear what constitutes generally accepted police practices since the case involves both the use of a taser and a firearm.  *See Kennedy v. Schlosser*, No. C11–1032, 2012 WL 6128439, at *4 (N.D. Iowa Dec. 10, 2012) (finding that Waller could testify generally regarding proper police practices but could not testify that the officers' actions constituted excessive force).  Additionally, Waller may testify that the officers recklessly approached the situation without first gathering information (third opinion).  This opinion helps the jury by providing them with context concerning the events leading up to the shooting.  *Williams v. Indiana State Police Department.*, 797 F.3d 468, 483 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1712 (2016) (citation omitted) ("The sequence of events leading up to the seizure is relevant because the reasonableness of the seizure is evaluated in light of the totality of the circumstances.").

Lastly, as a housekeeping matter, the State Defendants argue that Waller resolves credibility issues by opining on the credibility of the officers.  "Determining the weight and credibility of witness testimony" is a responsibility that "belongs to the jury."  *United States v. Scheffer*, 523 U.S. 303, 313 (1998) (citation omitted).  Though Waller may have

opinions different than those of the officers, he is precluded from opining on their credibility, or any other witness for that matter. This prohibition applies to all of the parties' witnesses.

### B. Jonathan Arden, MD

Plaintiff has designated Dr. Arden as an expert in forensic pathology. (*See* Filing No. 163-2, Expert Report of Jonathan Arden). Dr. Arden received his doctor of medicine from the University of Michigan in 1980 and has been certified in both anatomic and forensic pathology by the American Board of Pathology since 1985. (*Id.* at 1). He is currently licensed to practice medicine in four different states and has spent the better part of his career as a government-employed medical examiner. (*Id.*).

Dr. Arden's report contains five opinions, but the court will only discuss the one that is being challenged by the State Defendants: his analysis of the bullet trajectories. (*See id.* at 5 – 6). Dr. Arden opines that the autopsy evidence and Trooper Allen's statement of Jose's body positioning are inconsistent. (*Id.*). He explains Jose's arm could not have been positioned as Trooper Allen demonstrated in his video deposition based on the bullet trajectory of one of the gunshots. (*Id.* at 6). The State Defendants argue that this opinion goes beyond his scope of expertise as a forensic pathologist.

The court disagrees. It is within a forensic pathologist's expertise to opine on the manner in which fatal gunshots entered the body. *McKinney v. Duplain*, No. 1:04-cv-294-RLY-TAB, 2007 WL 1128852, at *5 (S.D. Ind. Apr. 16, 2007) (finding forensic pathologist competent to testify as to deceased's body position when struck with bullets); *Robinson*, 2017 WL 564682 at *11 – 12 (permitting Dr. Arden to opine on bullet

trajectories).  Dr. Arden's qualifications and experience also permit him to compare the

physical evidence with the officer's account of the shooting.  *Taylor v. Shields*, No. 13-

2241, 2017 WL 2633427, at *10 (E.D. Pa. June 19, 2017 ("Dr. Arden's medical

background qualified him to opine as to the trajectory of the bullet inside the human body

and his training as a forensic pathologist, along with his extensive experience with

gunshot cases, qualified him to opine as to the path of the bullet trajectory.").  Moreover,

while there may be discrepancies between the conclusions of the State Defendants' expert

and Dr. Arden, those discrepancies go towards the weight of the testimony, not the

admissibility.  *See United States v. Al-Awadi*, 873 F.3d 592, 600 (7th Cir. 2017).

      Accordingly, Dr. Arden is permitted to offer his opinion on the bullet trajectories.

### C.    Samuel Marso

      Plaintiff has designated Samuel Marso as an expert in forensic science with

specialties in firearm and tool mark identification as well as crime scene investigation

and shooting scene reconstruction.  (*See* Filing No. 163-4, Expert Report of Samuel

Marso).  Marso has over has 15 years of experience leading laboratory and field

investigative operations in support of law enforcement agencies.  (*Id.* at 1).  He is

certified by the Colorado Bureau of Investigation in firearm and tool mark examiner

training, and he is also trained as a forensic photographer and crime scene

reconstructionist.  (*Id.*).  He has received specialized training and certification in firearm

instruction, including Glock and Sig Sauer pistols—the firearms used in this case.  (*Id.*).

      Marso opines that the officers' stated location when they shot Jose is inconsistent

with the forensic evidence—namely the location of the firearm casings.  (*See id.* at 4 – 5).

He further explains that the officers were not within striking distance, even assuming Jose was threatening the officers.  (*Id.* at 4).  The State Defendants argue that this opinion is not reliable because Marso did not examine or test the actual firearms and ammunition that were used.  They also argue that examining similar firearm ejection patterns is not a sufficiently reliable methodology.

The State Defendants' arguments go to the weight of Marso's testimony, not the admissibility.  First, there is no requirement that an expert test the *exact* product or item; an expert who has tested similar ones may be sufficiently qualified under *Daubert*.  *See e.g. Jones v. National Cart Co., Inc.*, No. 12–1186, 2015 WL 5050265, at *2 – 3 (C.D. Ill. Aug. 26, 2015) (finding expert reliable where he had tested similar carts but not the exact cart at issue).  Second, while the State Defendants argue that the use of ejection casing patterns to determine a shooter's location is fraught with uncertainty and has not been peer-reviewed or generally accepted, this ignores Marso's *experience* as a reconstruction specialist.  *Schultz v. AkZo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citation omitted) (noting that *Daubert's* guideposts apply to scientific experts, but experiential experts are also permissible).  Marso's combined experience with firearms— including the Glock and Sig Sauer firearms used in this case—and with crime scene reconstruction qualifies him to opine on any inconsistencies between the forensic evidence and the officers' account of the shooting, even if his opinions are not infallible.  *Robinson*, 2017 WL 564682, at *12 – 13 (finding Marso qualified to render opinion on location of officer when shots were fired); *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir.

2010) (noting even "shaky" expert testimony may be admissible). As such, Marso is permitted to offer his opinion.[9]

### D.    Jayme Albin, LCSW

The last expert witness the State Defendants challenge is Jayme Albin. (*See* Filing No. 163-6, Plaintiff's Supplemental Rule 26(a)(2) Disclosures ("Plaintiff's Sup. Disclosures")). Albin has a bachelor's degree in Psychology from Purdue University and a master's degree in Social Work from Indiana University. (Filing No. 174-3, CV of Jayme Albin). She has one year of experience as a social worker at IU Health Arnett in Lafayette, Indiana and three years of experience as a licensed clinical therapist at Southern Hills Counseling Center in Paoli, Indiana. (*Id.*).

Albin served as one of Plaintiff's treatment providers, and so Plaintiff has designated Albin as a non-retained expert witness under Rule 26(a)(2)(C). Accordingly, Plaintiff has only disclosed the subject matter of Albin's testimony and a brief summary of her facts and opinions. *See* Fed. R. Civ. P. 26(a)(2)(C). Albin plans to testify about her observations during Plaintiff's counseling sessions after the shooting. The State Defendants seek to exclude, or at least limit, her testimony because (1) she was disclosed after Plaintiff's expert deadline, (2) the summary provided is not adequate, and (3) she is not qualified to make a diagnosis of Post-Traumatic Stress Disorder (PTSD).

---

[9] Marso also opines that "deadly force appears to have been an extreme and unnecessary measure." (Marso Report at 4). Even assuming he is qualified to render such an opinion, Marso is precluded from offering any opinion as to the reasonableness of the force—as is every witness—for the same reasons already mentioned with respect to Waller.

While true that Plaintiff disclosed Albin one month after the deadline, the disclosure was delayed, at least in part, by an earlier discovery dispute that was not resolved until June 16, 2017, and so the late disclosure was substantially justified. (*See* Filing No. 93); *see* Fed. R. Civ. P. 37(c)(1). In any event, the one month delay was harmless as the State Defendants had adequate time to prepare a rebuttal witness if necessary. *See Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir. 1996) (citation omitted) ("The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court.").

The State Defendant's contention that Albin's summary disclosure is inadequate is likewise unpersuasive. With respect to a non-retained expert, a party need only disclose the subject matter of the expert's testimony and a summary of the facts and opinions to which the expert is expected to testify. *See* Fed. R. Civ. P. 26(a)(2)(C). While Albin's disclosure could have included more information, it is sufficient under Rule 26(a)(2)(C). The disclosure explains that Albin will testify to matters reflected in her notes and reports contained within Plaintiff's counseling records (which were produced). (Plaintiff's Sup. Disclosures at 1). She will also testify about her observations during Plaintiff's counseling sessions. This is enough to give the State Defendants' adequate notice of her testimony. *Cf. Slabaugh v. LG Electronics USA, Inc.*, No. 1:12–cv–01020–RLY–MJD, 2015 WL 1396606, at *3 (S.D. Ind. Mar. 26, 2015).

Lastly, as both parties seem to agree, Albin—as a licensed social worker—is not qualified to render a diagnosis of PTSD. *See United States v. Crosby*, 713 F.2d 1066,

1076 – 77 (5th Cir. 1983) (holding that a social worker with master's degree not permitted to diagnose PTSD because it requires a medical diagnosis). Plaintiff explains that Albin does not intend to offer a diagnosis but argues that it is within the scope of Albin's practice to testify that Plaintiff's observed symptoms are consistent with the symptoms listed for PTSD in the Diagnostic and Statistical Manual V attributed to the diagnosis of PTSD. However, this seems to be nothing more than checking the side door, having already found the front door locked: opining that Plaintiff's observed symptoms are consistent with PTSD is tantamount to a diagnosis and would only confuse the jury. Albin, as Plaintiff's counselor, can certainly explain her observations and her opinions within the scope of her expertise, but her opinion on PTSD goes too far and will be precluded accordingly. *See Naquin v. Elevating Boats, LLC*, No. 10–4320, 2012 WL 1664257, at *6 – 8 (E.D. La. May, 11 2012) (collecting cases all finding social worker cannot diagnose PTSD).

### E.      Randall L. Murphy

The State Defendants have designated Randall Murphy as a rebuttal witness to Dennis Waller. (*See* Filing No. 165-1, Expert Report of Randall Murphy ("Murphy Report")). Murphy has a bachelor's degree in the Administration of Justice from Avila University and a master's degree in Business Management from Friend University. (*Id.* at 3). He has worked in various roles as a police officer in the Kansas City Police Department from 1972 through 2002, including a role as Commander of the Criminal Investigation Division. (*Id.* at 2 – 3). He has extensive experience in officer training, education, and management. (*See id.* at 1 – 2).

Murphy presents four opinions in his expert report. First, he opines that the officers reasonably responded to a domestic call; second, he opines that Trooper Allen used objectively reasonable force; third, he opines that it was reasonable to tase Jose in order to subdue him; and lastly, he opines that Trooper Allen properly used force in defense of another. (*Id.* at 5 – 10). Plaintiff seeks to bar Murphy's testimony because his opinions are nothing more than legal conclusions.

The court agrees that Murphy's second, third, and fourth opinions are impermissible for the same reasons expressed earlier with respect to Waller (Plaintiff's expert). The question of whether the officers' force was excessive rests within the province of the jury. *Thompson*, 472 F.3d at 458. Just as Waller is precluded from testifying that the officers' use of force was excessive, so too is Murphy from testifying that the officer's use of force was reasonable.

Murphy is permitted to offer his first opinion, provided that he does not opine on the officers' use of force. *See Jimenez v. City of Chicago*, 732 F.3d 710, 721 – 722 (7th Cir. 2013) (citations omitted) ("Expert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.").[10]

---

[10] Plaintiff also argues that Murphy's opinions are unreliable because they are based on a "cherry-picked" set of facts. *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001). However, it is clear that Murphy relies on Plaintiff's statement to law enforcement in addition to the officers' statements. (Murphy Report at 4 – 5). Moreover, the facts are in dispute

## F.     Dr. Thomas J. Sozio

The State Defendants have designated Dr. Sozio as an expert in forensic pathology.  (*See* Filing No. 163-3, Expert Report of Thomas Sozio).  Dr. Sozio is a doctor of osteopathic medicine who earned his degree from the Texas College of Osteopathic Medicine.  (*Id.* at 1).  He is board certified by the American Osteopathic Board of Pathology in both anatomic and forensic pathology.  (*Id.*).

Dr. Sozio offers several critiques of both Dr. James Jacobi's autopsy report and Dr. Arden's expert report.  (*Id.* at 3 – 4).  Plaintiff seeks to bar a portion of Dr. Sozio's report that is related to Jose's pain and suffering.  In response to Dr. Arden's contention that Jose suffered extreme pain before death, Dr. Sozio opines that because pain is affected by a number of variables—including whether drugs such as ethanol are present at the time of injury—it is difficult to quantify Jose's pain.  Plaintiff argues that Dr. Sozio, as a forensic pathologist, does not have any expertise to opine on the effects of alcohol intoxication on living persons.  The State Defendants respond by saying that Dr. Sozio does not offer an opinion on the severity of pain that Jose may have suffered, he only offers an opinion on the factors that influence pain and the difficulty of quantifying pain.

The court agrees with the State Defendants.  Forensic pathologists are qualified to render an opinion on a person's state of consciousness before death.  *E.g. White v.*

---

so it is unremarkable that he relies on a different version than what Plaintiff presents.  Plaintiff's challenge goes to the weight of Murphy's testimony, not the admissibility.  *See Al-Awadi*, 873 F.3d at 600.

*Gerardot*, No. 1:05-cv-382, 2008 WL 4372019, at *12 – 13(N.D. Ind. Sept. 23, 2008);

*see also Marinelli v. Beard*, No. 4:CV–07–0173, 2012 WL 5928367, at *53 (M.D. Pa.

Nov. 26, 2012) (noting that the state of consciousness of a victim at the time of the

shooting is well within the expertise of a forensic pathologist). Dr. Sozio does not seek to

offer an opinion on Jose's pain and suffering. He merely wishes to opine that pain is

difficult to quantify and that a number of variables, including intoxication, can affect a

person's level of pain in order to rebut Plaintiff's expert Dr. Arden. As a board certified

forensic pathologist, the court finds that Dr. Sozio is qualified to render such opinion.

Plaintiff attempts to disqualify Dr. Sozio by highlighting the fact that he admitted

in his deposition that he does not have any expertise in the effect of alcohol intoxication

on the level of pain suffered by an individual. (Filing No. 184, Deposition of Thomas

Sozio at 75:19 – 22). However, Dr. Sozio earlier explains that ethanol intoxication is

within the field of forensic pathology because it is the second most abused substance and

pathologists have to understand its effects. (*See id.* at 73:13 – 22). The court finds that

Dr. Sozio is minimally qualified to discuss the effects of alcohol, and any lack of

expertise can be brought up on cross examination. *Gayton*, 593 F.3d at 619.

Plaintiff wages two additional challenges to exclude Dr. Sozio's discussion of pain

and intoxication. First, Plaintiff argues that Dr. Sozio opined that alcohol intoxication is

medically irrelevant, and so any further opinions related to intoxication are irrelevant.

However, this opinion related to Jose's cause of death, not the level of pain an individual

can feel. *See Builders Ass'n of Greater Chicago v. County of Cook*, No. 96 C 1121, 1998

WL 111702, at *3 (N.D. Ill. Mar. 12, 1998) (citing 2 Weinstein's Evidence, §

401.04(3)(c)(i) (1997)) ("A single piece of evidence, then, may be irrelevant as to some issues but relevant as to others.").

Second, Plaintiff argues that Dr. Jacobi's testing methodology deviated so far from acceptable practices that any opinion based on his tests is unreliable. For example, Plaintiff argues that Dr. Jacobi does not account for the passage of time between Jose's death and the autopsy—a passage that could have affected Jose's blood alcohol level. Plaintiff argues that Dr. Jacobi improperly drew blood from the heart and pleural cavity as opposed to the femoral vein. Plaintiff also argues that Dr. Jacobi failed to use appropriate collection tubes to test the blood. However, Dr. Jacobi's methods are not so fundamentally flawed that it was improper for Dr. Sozio to rely on them. *See Walker v. Soo Line R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) (noting that medical professionals may rely on the work of other medical professionals); *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013) ("[A]n expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility").

Therefore, Dr. Sozio is permitted to offer his opinion on the difficulty of quantifying pain.


### G.    Bryan D. Chiles

The State Defendants, Officer Troutman, and the Town of West Baden have collectively offered Bryan Chiles as an expert on the taser that was deployed by Officer Troutman. (*See* Filing No. 167-1, Expert Report of Bryan Chiles ("Chiles Report")).

Chiles has an associate's degree in electronics. (*Id.* at 14). He currently is employed by Axon Enterprise, Inc. ("Axon") (formerly TASER International, Inc.) as a Technical Compliance Manager. (*Id.* at 11). He has over eleven years of experience in research and development for Axon and over nineteen years in the electronics and test equipment industry. (*Id.*). Chiles also has significant experience reviewing and analyzing taser download logs and has conducted tests on the X2 CEW taser—the same one used by Officer Troutman. (*Id.* at 9 – 11).

The primary purpose for the designation of Chiles is to explain the inconsistency between the time the officers said the taser went off (around 3:54) and the time reflected in Officer Troutman's taser download log (around 3:58). Chiles explains that all clocks (other than reference atomic clocks) experience "clock drift" which refers to when a clock runs at a different rate. (*Id.* at 8). He opines that because the taser had not been synchronized with an atomic clock since September of 2014, the taser experienced clock drift. (*See id.*). He ultimately concludes that when accounting for the proper amount of clock drift, the taser actually deployed at the time that the officers stated. (*Id.* at 9 – 10). Plaintiff seeks to exclude his testimony altogether because his opinion assumes that the clock drift was "perfectly linear" and because his report rebuts the validity of that assumption.

However, Plaintiff's attack on Chile's assumption and her criticisms of his opinion go to the weight of his testimony, not the admissibility. *Manpower, Inc.*, 732 F.3d at 808 ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury.").

Plaintiff also argues that Chiles cannot supply the bases for his opinion through later deposition testimony. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008). However, in his report, he explains his conclusions are based on his training and experience. (*See* Chiles Report at 9 – 10). And he has significant experience testing tasers. (*See id.* at 12 – 13). Even if he could have included more, his report gave Plaintiff notice of the substance of his opinion. *Metavante Corp.*, 619 F.3d at 762 (citation omitted) (noting purpose of report is to convey substance of expert's opinion, not to replicate the expert's testimony word for word).

Accordingly, the court will permit Chiles to offer his opinion on "clock drift."

## III.    Defendants' Motions for Summary Judgment

Plaintiff's Amended Complaint contains eleven counts. As an initial matter, however, Plaintiff has agreed that certain claims may be dismissed with prejudice. Plaintiff no longer intends to pursue any claims against First Sergeant Suding, so the court will grant Defendant Suding's motion for summary judgment on all claims against him. (*See* Filing No. 146, Plaintiff's Response at 1 n. 1). Plaintiff further "agrees that her state law claims are properly considered as wrongful death [claims] rather than survival claims" and so the court will grant summary judgment to Defendants in Count VIII. (*See id.*). Lastly, Plaintiff "recognizes that the Indiana Tort Claims Act bars her state law claims from proceeding against the individual officers who acted within the scope of their employment" and so the court will grant summary judgment to Trooper Allen and Officer Troutman on Counts VI, VII, and IX. (*Id.*); *see also Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) (citing Ind. Code § 34–13–3–5(b))

("Under the Indiana Tort Claims Act, there is no remedy against the individual employee so long as he was acting within the scope of his employment.").  With those concessions out of the way, the court now turns to Defendants arguments for summary judgment on the remaining counts.

**A.     Summary Judgment Legal Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, a court may grant summary judgment where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When reviewing a motion for summary judgment, the court views the facts in the light most favorable to the nonmoving party.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  If a reasonable jury could find for the nonmoving party, then summary judgment is not appropriate.  *Id.*

**B.     Plaintiff's Federal claims**

**(1)     42 U.S.C. § 1983**

42 U.S.C. § 1983 is the vehicle for bringing a federal claim against state officials who violate federal law.[11]  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017).  To establish a claim under § 1983, a plaintiff must show that the defendant "(1) acted under the color of state law; and (2) deprived [plaintiff] of a constitutional right."  *Estate of Perry v. Wenzel*, 872 F.3d 439, 452 (7th Cir. 2017) (citation omitted).  There is no dispute over whether Defendants acted under the color of state law.  The only issue with respect to each of Plaintiff's § 1983 claims is whether Defendants deprived Jose or Plaintiff of a constitutional right.

### (2) Excessive Force in violation of § 1983 against Trooper Allen and Officer Troutman

Trooper Allen and Officer Troutman argue that summary judgment is appropriate because their use of force was reasonable, and even if it was not, they are nonetheless entitled to qualified immunity. The court will address each argument in turn.

### (a) A Reasonable Jury Could Find the Officers' Use of Force was Unreasonable

---

[11] The text of the statute reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

The Fourth Amendment protects people from unreasonable seizures.  U.S. Const. amend. IV.  Because the use of excessive force, including deadly force, constitutes a seizure within the meaning of the Fourth Amendment, claims alleging excessive force are analyzed under the Fourth Amendment's reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S 1, 7 – 8 (1985); *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).

To determine whether an officer's use of force is reasonable, the court must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *See Garner*, 471 U.S. at 8 (citing *United States v. Place*, 462 U.S. 696, 703 (1983)); *Graham*, 490 U.S. at 396.  All of the facts and circumstances are considered, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Garner*, 471 U.S. at 8 – 9).

Law enforcement officers have the right to use *some* force when seizing an individual.  *See Graham*, 490 U.S. at 396 (noting the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion).  However, officers do not have the right to use deadly force absent a threat of serious harm or an act of resisting arrest for a serious crime.  *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) ("[A] person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of

force."); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) ("Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape.") (quoting *Garner*, 471 U.S. at 11 – 12).

When viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that the officers' use of force was unreasonable. Upon arriving to the residence, the officers did not observe any ongoing struggle between Plaintiff and Jose. Rather than inquire for more information, however, they rushed to the backyard. Plaintiff's expert opined that these actions do not conform to generally accepted police practices. While pre-seizure conduct alone cannot form the basis of a constitutional violation, it is certainly relevant in the totality of circumstances. *Indiana State Police Department*, 797 F.3d at 483.

Once in the back yard, the officers then drew their weapons and called out Jose's name—they did not announce their presence or instruct Jose to drop the weapon. After Jose appeared in the entrance of the shed with a pipe held down by his side and then began walking towards the officers, Trooper Allen and Officer Troutman fired seven shots, six of which struck and killed him. Jose never raised the pipe in a threatening manner or engaged in any aggressive behavior. He was also at least eight feet away when the officers fired. A reasonable jury could find that the officers' use of force was excessive given the circumstances. *See Weinmann*, 787 F.3d at 448 – 450 (holding sufficient evidence of excessive force where an officer shot a man holding a shotgun in

his lap but not threatening the officer); *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 582 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 1595 (2018) (holding sufficient evidence of excessive force where officers shot man wielding a gun pointed at the ground while walking towards them); *Cooper v. Sheehan*, 735 F.3d 153, 159 – 160 (4th Cir. 2013) (holding sufficient evidence of excessive force where officers shot man who held a shotgun that was pointed down, made no sudden moves, ignored no commands, and did not make any threats).

Trooper Allen and Officer Troutman argue that their use of force was reasonable but problematically rely on *their* version of the facts. *Weinmann*, 787 F.3d at 449; *see also Robinson*, 2017 WL 564682 at *19 – 20 (denying officer's motion for summary judgment where facts are disputed). There are critical factual disputes, and Plaintiff has offered evidence that discredits the officers' account of the shooting. *Cf. Muhammed*, 316 F.3d at 683 – 84.

For example, both officers argue that Officer Troutman used his taser before the officers opened fire, but Plaintiff has introduced evidence from which a reasonable jury could conclude that the taser was not fired immediately. Plaintiff explained that she heard one "shot" followed by six more, and she also explained that she is familiar with the sound of a taser. Surrounding neighbors did not hear the deployment of a taser, and Officer Troutman's taser log reflected that the taser was deployed four minutes after the shooting. Moreover, there are disputes on whether Jose was within striking distance of the officers, whether Jose was holding the pipe in a threatening manner, and whether Jose

responded to the officers' demands.  Factual disputes must be resolved by a jury.  *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).

The officers argue that their use of force was justified, even on Plaintiff's version of the facts, because Jose was holding the pipe in a threatening manner.  However, merely holding a weapon does not entitle officers to utilize deadly force.  *E.g. Hensley*, 876 F.3d at 582.  And whether Jose threatened the officers is in dispute.  *See Weinmann*, 787 F.3d at 446 (citation omitted) (noting that when summary judgment is involved, the court accepts the nonmoving party's version of the facts without vouching for their ultimate accuracy).  If it was *undisputed* that Jose had lunged towards Officer Troutman and began to swing the pipe, as the officers say, then they would have a strong case that their use of force was reasonable.  *E.g. Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018) (holding the use of deadly force reasonable where deceased pointed gun at officers); *Estate of Escobedo v. Martin*, 702 F.3d 388, 409 – 411 (7th Cir. 2012) (same).  However, the facts are disputed, and so a jury must resolve these issues, not the court.

The officers stress that they were responding to a rapidly escalating situation as well as crime of domestic violence.  A jury might reasonably come to that conclusion, but a jury might also reasonably conclude that it was the *officers* who are responsible for the escalation.  *See Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) (recognizing that a jury is typically responsible for resolving factual disputes when a plaintiff claims officers responded overzealously and with too little concern for safety).  Moreover, the officers did not observe any strangulation taking place, so even if deadly force might have been justified when Jose was actually choking Plaintiff, it was no longer justified once the two

were separated.  *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity.").

One final point, Officer Troutman argues that he should be entitled to summary judgment because there is no evidence that *he* used excessive force.  This argument has some merit because Officer Troutman only fired his weapon once, and five of the six bullets recovered from Jose's body were from Trooper Allen's firearm, not Officer Troutman's.  However, Plaintiff has presented just enough evidence for this question to be sent to the jury.  First, it is undisputed that Officer Troutman fired his weapon, and that one of the bullets could not be recovered from Jose's body, leaving open the possibility that it came from Officer Troutman's weapon.  Second, Trooper Allen believes that Officer Troutman's shot hit Jose.  (Filing No. 146-17, Trooper Allen's Responses to Plaintiff's Interrogatories at 2) ("[Trooper Allen] believes Officer Troutman fired once and hit Mr. Damiani.").  Third, Officer Troutman explained that he did not know whether he hit Jose.  (Troutman Dep. at 92:4 – 7).  From this evidence, a jury could conclude that Officer Troutman's lone shot struck Jose.

The officers are therefore not entitled to summary judgment.

### (b)     The Officers are not entitled to Qualified Immunity

Qualified immunity protects government officials from liability so long as their conduct does not violate clearly established constitutional or statutory law.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To withstand the defense of qualified immunity, a Plaintiff is required to show that (1) the official violated a constitutional or statutory

right, and (2) the particular right violated was "clearly established" at the time of the incident. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). The facts are taken in the light most favorable to Plaintiff. *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013).

The court has already determined that Plaintiff has shown a constitutional violation. *See id.*; *Estate of Perry*, 872 F.3d at 460. Her version of the facts show a violation of Jose's right to be free from excessive force.

However, Plaintiff must also show that Jose's right to be free from excessive force was clearly established at the time of the shooting. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). The Supreme Court has recently emphasized that courts ought "not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152 (citations omitted). There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft*, 563 U.S. at 741); *Estate of Perry*, 872 F.3d at 460 (noting qualified immunity analysis does not require a case with the exact same fact pattern). The court may look to other circuits to see if a right has been clearly established. *See Spreen v. Brey*, 961 F.2d 109, 113 (7th Cir. 1992). However, district court decisions cannot clearly establish a constitutional right. *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995).

At the time of the shooting, it was clearly established that a person has a constitutional right not to be shot absent an immediate threat to himself or others. *Garner*, 471 U.S. at 11; *Indiana State Police Department*, 797 F.3d at 484 (citations omitted).

Even if *Garner* no longer clearly establishes such right,[12] other cases reinforce that officers may not use deadly force on a person absent an immediate threat of harm, even when the person is holding a deadly weapon. *E.g. Weinmann*, 787 F.3d 450 – 452.

The facts of *Weinmann* are closely analogous to this case. In *Weinmann*, a husband and wife got into an argument which resulted in the husband going to the garage, drinking a half bottle of vodka, and putting the barrel of a shotgun in his mouth. *Id.* at 446. Within three minutes of arriving at the couple's house, a law enforcement officer kicked down the garage door and shot the husband four times. *Id.* at 446 – 447. The Seventh Circuit held that the officer violated the man's constitutional right not to be shot despite the officer knowing that the man had access to a firearm, a 911 caller said the man was suicidal, the man did not respond to the officer's knocks, and there were suspicious sounds coming from inside the garage. *Id.* at 449 – 450. The Court found that

---

[12] Many courts have interpreted *Garner* as clearly establishing a person's right to be free from deadly force absent an immediate threat. *E.g. Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011) (noting that the immediate threat rule of *Garner* "has been settled law for a generation"). However, the Supreme Court has recently criticized lower courts for using both *Graham* and *Garner* to show that a particular right was clearly established. *Kisela*, 138 S. Ct. at 1153 (noting that *Garner* and *Graham* do not create clearly established law outside an obvious case) (citation omitted); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (same); *see also Comsys, Inc. v. Pacetti*, 893 F.3d 468, 476 (7th Cir. 2018) (Gilbert, D.J. dissenting) (noting that the Supreme Court continues to "move the ball" on when the law is clearly established for purposes of qualified immunity).

there was no imminent danger to anyone despite the fact that the man was holding a shotgun.  *Id.*  Accordingly, *Weinmann* clearly establishes that shooting a person who is holding a weapon but posing no immediate threat is unconstitutional.

While *Weinmann* is controlling, decisions from other circuits have also established the same right.   *Cooper*, 735 F.3d at 159 – 160; *Hayes v. County of San Diego*, 736 F.3d 1223, 1235 (9th Cir. 2013) (holding officers use of deadly force unreasonable where officers, while responding to a domestic disturbance, shot person who had a "clueless" expression on his face and was holding a knife in a non-threatening manner).

Because Jose's right to be free from deadly force was clearly established, the officers are not entitled to qualified immunity.  Accordingly, the officers are not entitled to summary judgment on Plaintiff's excessive force claim.

### (3)  Failure to Intervene in Violation of 42 U.S.C. § 1983 against Trooper Allen and Officer Troutman

An officer may be liable for failing to prevent a constitutional violation where the officer had reason to know "that excessive force was being used" and "the officer had a realistic opportunity to intervene to prevent the harm from occurring."  *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citations omitted).  Though ordinarily a question for the jury, where no reasonable jury could find that an officer had a realistic opportunity to intervene, the court can decide the issue as a matter of law.  *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997) (citation omitted).

Here, neither officer had a realistic opportunity to intervene.  The entire sequence from when the officers arrived to the residence to when the officers fired at Jose occurred

in less than a minute (forty-one seconds). The time between when the officers arrived in the backyard and when they fired at Jose was even less. Even Plaintiff's expert acknowledged the timeline was "extremely short" and the officers had a "needlessly rushed approach." (Waller Rep. at 9). Simply put, no reasonable jury could find that either officer had a meaningful opportunity to intervene given how rapidly the circumstances evolved. *Lanigan*, 110 F.3d at 478 (officer not required to throw himself between another officer and plaintiff to interrupt an imminent poke); *cf. Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (officer not entitled to summary judgment where plaintiff alleged that officer was idly standing by while another officer beat plaintiff).

Accordingly, the officers are entitled to summary judgment on Plaintiff's failure to intervene claim.

### (4) Conspiracy to Deprive of Constitutional Rights in violation of 42 U.S.C. § 1983 against Trooper Allen and Officer Troutman;

"A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means.'" *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). To establish a claim for civil conspiracy, a plaintiff must show "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Id.* (citing *Scherer*, 840 F.2d at 442).

Here, there is no evidence from which a reasonable jury could conclude that the officers reached an agreement to deprive Jose of his constitutional rights. There was no

time to form an agreement: the officers were responding to a 911 call made by Plaintiff, and as already explained, the entire sequence spanned only 41 seconds. *Cf. Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (conspiracy claim plausible where complaint alleged pattern of harassment by several officers over a period of months). Since Plaintiff has not introduced any evidence of an agreement, the officers are entitled to summary judgment on Plaintiff's civil conspiracy claim.

### (5) Denial of Medical Attention in violation of 42 U.S.C. § 1983 against Trooper Allen and Officer Troutman;[13]

The Fourth Amendment's reasonableness standard governs a plaintiff's claim that officers failed to provide medical care. *Horton*, 883 F.3d at 953. The Seventh Circuit has instructed courts to consider four factors when analyzing claims that officers unreasonably denied medical care: "(1) whether the officer had notice of the medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests that might inhibit providing treatment." *Id.* (citing *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011)). However, the overall inquiry is still one of reasonableness. *See id.* As the Seventh Circuit has stated "[t]he Fourth Amendment requires reasonableness, not immediacy." *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010).

There is no doubt that the officers had notice of Jose's medical needs, and those needs were serious. However, the officers summoned medical attention immediately, and

---

[13] Plaintiff's claim for denial of medical attention appears in the Amended Complaint but not in the Statement of Claims. However, it appears to be understood by both sides that Plaintiff has adequately alleged this claim.

the medical team arrived less than 5 minutes after the shooting. Moreover, after the

shooting there was at least some law enforcement interest in securing the scene: two

neighbors ran over to see what had occurred, and Plaintiff was still on the porch. While

both officers perhaps could have—maybe, even should have—rendered additional aid,

existing precedent places this question beyond debate: no reasonable jury could find the

officers' actions violated the Fourth Amendment. *See Horton*, 883 F.3d at 953 – 54

(holding no Fourth Amendment violation when officer waited seven minutes to summon

medical care because he had run out of ammunition and feared for his life); *Sallenger*,

630 F.3d at 504 (holding no Fourth Amendment violation where officers arrived at a

home and subdued a large man within minutes but did not summon medical care until

twenty-three minutes after their arrival); *Florek v. Village of Mundelein, Ill.*, 649 F.3d

594, 601 (7th Cir. 2011) (citation omitted) (noting that promptly calling an ambulance

will typically qualify as reasonable under the Fourth Amendment); *Tatum v. City and

County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) (holding that a police

officer who promptly summons medical assistance acts reasonably under the Fourth

Amendment even if the officer did not administer CPR).

Accordingly, the court will grant the officers' motion for summary judgment as to

Plaintiff's denial of medical attention claim.

### (6) Denial of Access to Courts and the Right to Seek a Remedy in violation of 42 U.S.C. § 1983 against Trooper Allen, Officer Troutman, and Detective Staggs;

The First and Fourteenth Amendments grant individuals the right to seek legal

relief for any claim that has a reasonable basis in law and fact. *Rossi v. City of Chicago*,

790 F.3d 729, 734 (7th Cir. 2015) (citation omitted); *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 422 (7th Cir. 2000) (citations omitted). State actors who intentionally conceal the true facts of a crime infringe this right to judicial access. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984); *Harrell v. Cook*, 169 F.3d 428, 432 (7th Cir. 1999); *Rossi*, 790 F.3d at 734.

However, the right to judicial access is not without limitations. Plaintiffs do not have a constitutional right to have the police investigate their case at all—let alone to their satisfaction. *Id.* at 735 (citing *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196 (1989)). The Seventh Circuit has explained that a right to judicial access claim must satisfy a high bar:

> [M]ere inactivity by police does not give rise to a constitutional claim. For this reason, the operative question is not whether [Plaintiff's] case would have been better had the police conducted a worthy investigation, but whether their failure to do so limited [Plaintiff's] ability to obtain legal redress to such degree that it constituted a denial of judicial access.

*Id.* Moreover, Plaintiffs who witness the alleged unlawful conduct or who are personally involved cannot claim a violation of the right to judicial access because they have firsthand knowledge of the facts and circumstances. *Thompson v. Boggs*, 33 F.3d 847, 852 – 853 (7th Cir. 1994); *Cefalu*, 211 F.3d at 423 – 424.

Here, the officers and the investigating personnel did not violate Plaintiff's right to judicial access. Plaintiff witnessed the shooting firsthand along with other eye witnesses who have filed declarations on Plaintiff's behalf. An investigation took place the same day of the shooting, and evidence was collected. (*See* Filing No. 146-15, Report of Mark Green at 1). Plaintiff was able to depose the officers and investigating personnel, and she

filed her lawsuit within a year of the shooting. All of this shows that Plaintiff's right to judicial access has not been violated.

Plaintiff, to her credit, points out several flaws in the investigation. For example, she notes that Staggs did not photograph or direct crime scene technicians to preserve a mark in the grass that Trooper Allen made to show where he was standing. Staggs told crime scene investigators the officers' version of the story, which influenced the collection of evidence. Plaintiff also points out the crime scene technicians appeared to have limited their search of blood spots to the area surrounding Jose's body and did not collect any evidence of gunshot residue. Staggs only interviewed one witness, and written statements by Plaintiff and Groff were lost.

While these omissions may amount to a shoddy investigation, they do not amount to a constitutional violation under *Rossi* and existing Seventh Circuit precedent. In *Rossi*, the investigating detective failed to meet standard police protocol while investigating an assault where one of the participants was a Chicago police officer. *See Rossi*, 790 F.3d at 732. He "did practically no work on the case; he followed zero leads, did not inspect the crime scene, and questioned no witnesses other than [the plaintiff]." *Id.* The Seventh Circuit held that the plaintiff failed to make out a claim for the denial of judicial access reasoning that the actions of the detective did not harm plaintiff's ability to obtain appropriate relief because the facts were known to him. *See id.* at 736 – 737. Here, as in *Rossi*, the investigation—while subject to criticism—did not prevent Plaintiff from seeking legal redress because she had firsthand knowledge of the shooting, and was still able to "discover the facts on [her] own." *Id.* at 736.

Plaintiff also argues that in addition to failing to preserve evidence, the officers and Staggs concealed evidence. Specifically, she argues that Detective Staggs, Trooper Allen, and Officer Troutman concocted a false narrative of the shooting. As evidence of the cover-up, she notes that Staggs and Allen talked within 15 minutes of the shooting and that Staggs met with both officers before each officer was interviewed by ISP. However, as already noted, the facts surrounding the shooting were observed by Plaintiff. Moreover, the phone call between Staggs and Allen, and the meeting between all three—even if improper—fall short of showing a constitutional violation. *Cf. Bell*, 746 F.2d at 1263 – 1264 (holding the right of judicial access violated where police killed a man, created a false story, and obstructed the prosecution of any claims for twenty years); *Harrell*, 169 F.3d at 432 (holding the right of judicial access violated where plaintiff alleged police deliberately removed a critical piece of plaintiff's evidence from the police garage in order to foil plaintiff's efforts to pursue a legal action).

Plaintiff witnessed the shooting and has not produced sufficient evidence of a violation of her right to judicial access. Trooper Allen, Officer Troutman, and Detective Staggs are, therefore, entitled to summary judgment on Plaintiff's denial of judicial access claim.

### (7) *Monell* theory of liability under 42 U.S.C. § 1983 against the Town of West Baden Springs[14]

---

[14] There does not appear to be a *Monell* claim in the Amended Complaint. (*See* Amended Complaint). However, Plaintiff included her *Monell* claims in her Statement of Claims (Filing No. 121), and it appears to be the understanding of the parties that Plaintiff has advanced these claims all along.

Municipalities can be held liable under § 1983 for constitutional violations. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). However, a municipality is not liable solely because it employed a tortfeasor. *Id.* at 691. A plaintiff must show that the municipality, itself, is "responsible" for the constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 394 (1989). This typically occurs where a constitutional violation is caused by (1) an official policy adopted and promulgated by the municipality's officers, (2) a custom or practice that is widespread throughout the municipality, or (3) an official who has final policy-making authority for the municipality. *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010).

Plaintiff proceeds with two theories of municipal liability. First, she argues that Officer Troutman's use of force was caused by the town of West Baden Spring's ("West Baden") total lack of a policy governing his force. *See Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017).

While a municipality may be held liable for choosing not to enact a policy, here, West Baden does have standard operating procedures ("SOPs") that guide its officers' use of force. (Filing No. 146-46, West Baden Police Department Use of Force Standard Operating Procedures ("SOPs")). Kendrick Andrews, Assistant Chief of Police for West Baden, explained in his deposition that the SOPs are "guidelines" that inform an officer's decision to use force. (Filing No. 146-41, Deposition of Kendrick Andrews ("Andrews Dep.") at 70:16 – 20). He further explained that the SOPs are not "set in stone" and that

officers may deviate from them so long as they can articulate a good reason for doing so. (*See id.* at 70:16 – 20; 72:9 – 18).

"[A] policy *not* to have a policy" may form the basis of a *Monell* liability. *Glisson*, 849 F.3d at 383 (Sykes, J. dissenting). However, West Baden had a policy: SOPs guide an officer's decision to use force, but an officer may deviate from the SOPs so long as there is a good reason to do so. That "policy" might be subject to other criticism—say, it is unconstitutional—but that is quite different from saying that there is *no policy at all*. *Cf. Glisson*, 849 F.3d at 380 – 382 (holding that a plaintiff had presented sufficient evidence for a jury to find municipal liability where the defendant chose not to adopt recommended guidelines despite being instructed otherwise seven years earlier). The court understands Plaintiff's argument to be the latter, which means her argument must fail.[15]

Second, Plaintiff' argues that West Baden delegated policymaking authority on the use of force to its "line-level officers." Thus, Officer Troutman had final decision-

---

[15] Plaintiff's first *Monell* theory is somewhat of a moving target. To the extent that Plaintiff challenges the sufficiency of West Baden's policy—that West Baden's policy contains critical omissions—her claim fails because she has only pointed to a single incident which is insufficient to establish liability. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 – 824 (1985); *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (noting that a claim objecting to omissions in a municipal policy requires more evidence than just a single incident). To the extent that Plaintiff asserts the single incident in the present case is sufficient to hold West Baden liable, Plaintiff has not made a showing that West Baden's policy is unconstitutional on its face nor has she pointed to a case holding a similar policy unconstitutional. *See Tuttle*, 471 U.S. at 823 – 824 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

making authority with respect to the amount of force used, and so his use of force constitutes official "policy" of West Baden.

A municipality may be liable for decisions made by individuals who have final, policy-making authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). However, individuals do not have policy-making authority just because they have discretion in carrying out their function. *Id.* at 481 – 482. The individual must be responsible for establishing final governmental policy with respect to the particular issue. *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (citation omitted).

Plaintiff has not offered any evidence that Officer Troutman had final policy-making authority on behalf of West Baden, or that Officer Troutman was the "apex of authority" with respect to the department's use of force. *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) (citation omitted). In fact, Andrews explained that the chief is typically responsible for establishing the policy of the department. (*See* Andrews Dep. at 28:22 – 24; 29:1 – 3); *see also Vodak*, 639 F.3d at 747 – 748 (holding that a police superintendent had final policy making authority with respect to controlling demonstrations). While Officer Troutman had discretion to deviate from West Baden's use of force SOPs, "authority to make final policy in a given area requires more than mere discretion to act." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (citations omitted); *Pembaur*, 475 U.S. at 481 – 482. Because there was no policy making authority delegated to Officer Troutman, he is not a "final policymaker," and thus, his decision to use force cannot be considered the "policy" of West Baden.

Plaintiff further argues that Officer Troutman was a final policymaker because (1) he was not constrained by West Baden's SOPs, (2) his decision was not subject to meaningful review, and (3) his decision to use force was within the realm of his authority. *See Valentino*, 575 F.3d at 676 (discussing three factors that are helpful in determining whether an official is a final decision-maker). However, just because he was a final *decision-maker*, does not mean that he was a final *policy-maker*. *See id.* ("It is a well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority. There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.") (internal quotations and citations omitted). While Officer Troutman may have been delegated the authority to make the final decision on whether to use force (as is the case with most officers), he was not delegated any authority to establish policy on the use of force for the entire department.

Accordingly, West Baden is entitled to summary judgment on Plaintiff's *Monell* claims.

**C.      Plaintiff's State Law claims**

**(1)      Assault and Battery and Wrongful Death in violation of Indiana law against the Town of West Baden Springs**

Although Plaintiff is barred from pursuing her state law claims against the individual officers under Indiana's Tort Claims Act, she may still pursue state law claims against West Baden—Officer Troutman's employer. *See Fidler v. City of Indianapolis*, 428 F.Supp.2d 857, 866 (S.D. Ind. 2006) (Hamilton, J.) (noting that a plaintiff could assert state tort claims against an officer's employer where the officer was acting within the scope of his employment). West Baden does not dispute that Officer Troutman was working within the scope of his employment at the time of the shooting.[16]

Plaintiff and West Baden agree that her claims for assault and battery and for wrongful death rise or fall with Plaintiff's excessive force claim. (*See* Plaintiff's Response at 46; Filing No. 153, Officer Troutman and West Baden's Reply at 15); *see also Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) ("If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery.") (citations omitted); *see Tom v. Voida*, 654 N.E.2d 776, 787 (Ind. Ct. App. 1995) (holding that plaintiff failed to make out a claim for wrongful death under Indiana law where the officer did not use excessive force). Since Plaintiff's excessive force claim against Officer Troutman should be decided by a jury, so too should Plaintiff's claims for assault and battery and wrongful death against West Baden.

West Baden's motion for summary judgment with respect to these state law tort claims is therefore denied.

### (2) Intentional Infliction of Emotional Distress in violation of Indiana Law against West Baden

---

[16] Plaintiff also brings state law claims against the Town of French Lick ("French Lick"), but these claims fail for reasons explained later in this Entry.

Under Indiana law, intentional infliction of emotional distress occurs when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another . . . ." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991) (quoting Restatement (Second) of Torts § 46 (1965)). The basis for the tort is "the intent to harm one emotionally." *Id.* Indiana courts have stressed that the requirements to prove intentional infliction of emotional distress are rigorous. *Board of Trustees of Purdue University v. Eisenstein*, 87 N.E.3d 481, 500 (Ind. Ct. App. 2017) (citations omitted); *see Ledbetter v. Ross*, 725 N.E.2d 120, 124 (Ind. Ct. App. 2000) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 12 at 61 (5th ed. 1984)).

Here, there is insufficient evidence as a matter of law that the officers intended to emotionally harm Plaintiff. The officers were responding to a 911 call concerning a domestic strangulation. Their encounter with Plaintiff at the front door was very brief, and the entire sequence, from when the officers arrived until when Jose was shot, spanned no more than one minute. Other than the officers' general awareness that Plaintiff was in the backyard, there is no evidence that the officers intended— intentionally or recklessly—to *harm Plaintiff*, and their general awareness of her presence is insufficient to establish intent under Indiana's rigorous standard. *See Lachenman v. Stice*, 838 N.E.2d 451, 456 – 57 (Ind. Ct. App. 2005) (discussing the standard for claims

of intentional infliction of emotional distress).   Accordingly, West Baden is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.[17]

### D.   Plaintiff's claims against the Town of French Lick

No French Lick officer was involved in the shooting.  However, Plaintiff contends that French Lick is nonetheless liable under *Monell* and Indiana agency law for the actions of Officer Troutman.

### (1)   French Lick is not Liable under *Monell*

A municipality may be liable for actions of a third-party where the municipality delegates its responsibilities to the third-party.  *E.g. King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("[A municipality] cannot shield itself from § 1983 liability by contracting out its duty to provide medical services.").  "The underlying rationale is not based on *respondent superior*, but rather on the fact that the private company's policy becomes that of the [municipality] if the [municipality] delegates final decision-making authority to it."  *Id.* (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 – 706 (11th Cir. 1985)).

Plaintiff argues that West Baden's policies became those of French Lick because French Lick contracted out its duty to provide police services within the town of French Lick when no French Lick officers were scheduled.  Assuming without deciding that this rationale—the "third-party contract" rule—from *King* applies in this case, Plaintiff's

---

[17] Plaintiff has not brought a claim for negligent infliction of emotional distress.  *See Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind. 2000) (holding a plaintiff may recover under a claim for negligent infliction of emotional distress where there is proof that the plaintiff actually witnessed the death of a loved one caused by the defendant's negligent or otherwise tortious conduct).

argument still fails for reasons already explained: West Baden's policy (or lack thereof) was not constitutionally deficient. So even if French Lick became responsible for West Baden's policy, it is not liable because Plaintiff failed to show that West Baden's policy could form the basis for § 1983 liability under *Monell*.[18]

### (2) Officer Troutman was not French Lick's Agent

Under Indiana law, an entity may be vicariously liable for the acts committed by its agent. *See Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 164 (Ind. 2014) (citing Restatement (Third) of Agency § 1.01 (2006)); *see also Yost v. Wabash College*, 3 N.E.3d 509, 518 – 519 (Ind. 2014). To establish an agency relationship, a plaintiff must show "(1) a manifestation of consent by the principal to the agent; (2) an acceptance of the authority by the agent; and (3) control exerted by the principal over the agent." *Douglas v. Monroe*, 743 N.E.2d 1181, 1186 (Ind. Ct. App. 2001) (citation omitted). Here, the parties dispute only the third factor: control.

"[T]he keystone of the agency relationship is the principal's ability to define and control the agent's activities." *Northern Assur. Co. of America v. Lark*, 845 F.Supp. 1301, 1306 (S.D. Ind. 1993) (Tinder, J.) (citations omitted) (applying Indiana law). The principal need not control every aspect of the agent's activities. *Demming v. Underwood*, 943 N.E.2d 878, 885 (Ind. Ct. App. 2011) (citation omitted). However, it must have sufficient control of an agent's day-to-day activities. *Leon v. Caterpillar Indus., Inc.*, 69

---

[18] In a footnote, Plaintiff argues, alternatively, that French Lick is liable because it imposed its deficient use of force policy on West Baden. However, there is no evidence that Officer Troutman knew of French Lick's policy or was acting pursuant to French Lick's policy.

F.3d 1326, 1333 (7th Cir. 1995) (applying Indiana law) ("Indiana case law establishes that control over the day to day operations is the key to establishing an agency relationship."); *Delta Tau Delta*, 9 N.E.3d at 164 – 165.

In the present case, there is some evidence that supports the conclusion that French Lick had control over Officer Troutman. There is a joint schedule for both police departments. (Filing No. 146-42, Joint Schedule). French Lick's Chief of Police, Thomas McCracken, testified that he creates a joint schedule for both French Lick and West Baden. (Filing No. 146-38, Deposition of Thomas McCracken ("McCracken Dep.") at 39:9 – 24; 40:1 – 21). He stated that he ordinarily receives West Baden's schedule from the Assistant Chief of Police from West Baden, and then integrates it into one; however, there is evidence that West Baden officers contact him directly for scheduling matters. (*See* Filing No. 146-44, E-mails regarding Scheduling).[19]

Additionally, French Lick and West Baden officers attend the same training classes, some of which are conducted by French Lick officers. (Filing No. 146-39, Deposition of Kenneth Qualkenbush ("Qualkenbush Dep.") at 22:15 – 24; 23:1 – 17). In fact, it is not uncommon for West Baden and French Lick to conduct yearly training together "as one department with two different town boards." (*Id.* at 186:21 – 24; 187:1 – 2). Moreover, when a situation arises in French Lick, West Baden officers ordinarily follow the instructions of French Lick officers. (*Id.* at 35:16 – 24; 36:1 – 17).

---

[19] Joint scheduling is utilized because French Lick does not have the "manpower" to adequately staff every hour. (McCracken Dep. at 64:13 – 20).

On the other hand, there is significantly more evidence that French Lick lacks sufficient control over West Baden officers. The West Baden police department and French Lick police department are distinct departments meaning they are two separate entities. (*Id.* 190:23 – 24; 191:1 – 5). Each hires its own police officers. (*Id.* 191:6 – 12). French Lick cannot hire, discipline, or fire West Baden officers. (*Id.* 191:10 – 18; Filing No. 131-1, Affidavit of Thomas McCracken ("McCracken Aff.") at 1 ¶ 4). French Lick does not provide any equipment to West Baden officers and cannot direct the training of West Baden officers. (McCracken Aff. at 2, ¶¶ 5, 6). French Lick does not direct the investigatory methods of West Baden officers nor does it provide training on any of its own SOPs. (*Id.* at ¶¶ 7, 8). West Baden officers use their own forms, police department systems, and software. (Andrews Dep. 119:10 – 16). Moreover, with respect to the joint training sessions, these training sessions also frequently include sheriff's deputies, Paoli police officers, and Orleans police officers, in addition to West Baden and French Lick police officers. (Qualkenbush Dep. at 192:1 – 19).

The court finds that no agency relationship exists as a matter of law between French Lick and Officer Troutman. French Lick cannot hire, fire, or discipline West Baden officers nor does it provide them with equipment or training specific to French Lick's procedures. While French Lick controls the scheduling of West Baden officers, it does not otherwise control any other aspect of their day-to-day activities. Even when viewing the evidence in the light most favorable to Plaintiff, French Lick only has a small measure of control, which is insufficient to find an agency relationship under Indiana law. *See Delta Tau Delta*, 9 N.E.3d at 164 – 165 (holding that a national fraternity was

not vicariously liable for the acts of its local fraternity despite evidence that the national fraternity provided organizational guidance to the local fraternity and had the right to sanction the local fraternity); *Leon*, 69 F.3d at 1336 (holding no agency relationship between manufacturer and dealer where sales agreement between the parties disavowed any agency relationship and manufacturer was only minimally involved in the dealer's business); *SelectSun GMBH v. Porter, Inc.*, No. 1:14-CV-215, 2017 WL 1178732, at *7 (N.D. Ind. Mar. 30, 2017) (finding no agency relationship where there was no evidence that the manufacturer controlled two dealers' employment or logistics decisions).

Accordingly, no agency relationship exists, and French Lick is entitled to judgement as a matter of law.

## IV. Conclusion

For the reasons stated above,

1. The State Defendants' Motion to Exclude and/or Limit Testimony of Plaintiff's Expert Witnesses (Filing No. 163) is **GRANTED IN PART** and **DENIED IN PART** in accordance with this Entry.

2. Plaintiff's Motion to Bar the Testimony of Randall Murphy (Filing No. 165) is **GRANTED IN PART** and **DENIED IN PART** in accordance with this Entry.

3. Plaintiff's Motion to Bar Portions of the Testimony of Thomas Sozio (Filing No. 166) is **DENIED**.

4. Plaintiff's Motion to Bar the Testimony of Bryan Chiles (Filing No. 167) is **DENIED**.

5. French Lick's Motion for Summary Judgment (Filing No. 131) is **GRANTED**.

6. West Baden and Officer Troutman's Motion for Summary Judgment (Filing No. 128) is **GRANTED IN PART** and **DENIED IN PART**.

7. Trooper Allen, Detective Staggs, and Sergeant Suding's Motion for Summary Judgment (Filing No. 133) is **GRANTED IN PART** and **DENIED IN PART**.

Three claims remain for trial.

- Excessive force in violation of 42 U.S.C. § 1983 against Trooper Allen and Officer Troutman.

- Assault and battery against West Baden under a *respondeat superior* theory of liability.

- Wrongful death against West Baden under a *respondeat superior* theory of liability.

**SO ORDERED** this 28th day of August 2018.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.